# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| STEPHEN J. PALUMBO and LORI A. PALUMBO, as Co-Trustees of the Carmen John Palumbo Revocable Trust Dated October 30, 1997, as completely amended February 4, 2023,<br><br>Petitioner,<br><br>v.<br><br>GREGORY M. PALUMBO,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>) C.A. No. 2024-0661-DH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# **REPORT**

Report: August 10, 2026
Date Submitted: April 23, 2026

Brian J. Ferry, Ferry Joseph, P.A., Wilmington, DE; *Attorney for Petitioners Stephen J. Palumbo and Lori A. Palumbo*.

Gregory M. Palumbo; *Pro se*.

**HUME, IV, M.**

This case involves the Plaintiff siblings' attempt to remove their Respondent brother as a co-trustee and his cross-request for trust accounting. Boiling beneath the surface is an intense personal dislike between the parties. The waves of discord crested the parties' interpersonal relationship and made their way into the trial and post-trial submissions. The self-represented Respondent, a disbarred attorney, allowed his animus for his siblings to take charge of his better judgment. His bitterness triggered acts in bad faith during and after trial. This opinion resolves Petitioners' request for removal of a trustee and Respondent's counter-petition for accounting.

## I.    BACKGROUND[1]

On October 30, 1997, Carmen John Palumbo ("Carmen" or "Decedent") entered a Revocable Trust Agreement, naming himself as settlor and trustee.[2] Three years later, he entered a First Supplemental Agreement.[3] Finally, in 2003, Carmen

---

[1] The facts set forth herein were proven by a preponderance of the evidence at trial. Factual citations are to: the Pre-Trial Stipulation and Order ("PTO"), D.I. 54; Resp't's Draft Joint Pre-Trial Stipulation and Proposed Order ("RPTO"), D.I. 55; Pet'rs' Post-Trial Summation ("PPTB"), D.I. 68; Resp't's Post Trial Brief ("RPTB"), D.I. 86; Stephen J. Palumbo and Lori A. Palumbo's Trial Witness Identification ("JX"), D.I. 32; and Trial Transcript ("Tr."), D.I, 67. Additional Citations are to Pet'rs' Amended Petition for Removal of Co-Trustee ("Compl."), D.I. 9; Palumbo, Gregory Resp't's Answer to Petitioners Amended Petition for Removal of Co Trustee ("Resp't's Ans."), D.I. 11; and Pet'rs' Answer to Respondent's Petition for Accounting ("Pet'rs' Ans."), D.I. 15.

[2] PTO ¶ 3; Compl., ¶ 4.

[3] PTO ¶ 4; Compl., ¶ 4.

1

executed the Complete Amendment to Carmen John Palumbo Revocable Trust Agreement ("2003 Amended Trust").[4]  Carmen had three children: Stephen J. Palumbo ("Stephen"), Lori A. Palumbo ("Lori"), and Gregory M. Palumbo ("Gregory").[5]  The 2003 Amended Trust named Carmen's three children as equal beneficiaries of the residual trust assets.[6]  Additionally, the 2003 Amended Trust named Gregory, Stephen, and Lori as successor trustees should Carmen no longer be able to serve.[7]

In 2012, Carmen executed a Supplemental Amendment to the trust, which directed all of Carmen's stock and interest in Palumbo Car Care Center, Inc. to Stephen.[8]

Gregory was an attorney and member of the Pennsylvania bar.[9]  In 2018, the Supreme Court of Pennsylvania placed him on temporary suspension.[10]  Five years

---

[4] PTO ¶ 5; Compl., Ex. A.

[5] Compl., ¶¶ 1–3, 5.  For ease of comprehension I refer to the children by their first names and intend no disrespect to the parties.

[6] *Id.* at Ex. A at B.(2); PTO ¶ 7.

[7] PTO ¶ 6; Compl., Ex. A, Art. 12.

[8] PTO ¶ 9.

[9] *Id.* at ¶ 11.

[10] *Id.*

later, in 2023, Gregory was convicted of multiple felonies.[11]  Several months following, he submitted his unconditional resignation from the Pennsylvania bar, and the Supreme Court disbarred him in 2024.[12]

On May 3, 2022, Carmen passed away.[13]  Immediately following, Stephen, Lori, and Gregory assumed their roles as trustees over the 2003 Amended Trust.[14]

### A.  Before Decedent's death, Gregory forges documents related to the estate.

Stephen testified that even before Decedent passed away, Gregory committed misconduct against Decedent and the prospective estate.  In September 2021, Stephen filed for emergency temporary guardianship over Decedent.[15]  Stephen explained that Gregory abused his Durable Power of Attorney for Decedent to misappropriate funds, incur $11,000 in unauthorized charges on Decedent's

---

[11] PTO ¶ 13.  Additionally, Gregory stipulated at trial to the existence of his "criminal issues in Pennsylvania."  Tr. 44:06–11.  The Complaint alleges that on September 6, 2023, Gregory was found guilty of six discrete criminal offenses.  *See* Compl. ¶ 9.  Gregory's Answer supplemented that "all offenses other than robbery and carrying a firearm . . . were dismissed at sentencing due to the doctrine of merger."  Resp't's Ans. ¶ 9.

[12] PTO ¶¶ 14–15; *see* JX 5 (Pennsylvania Supreme Court temporary suspension order).

[13] PTO ¶ 10; Compl. ¶ 7; JX 6 (Pennsylvania Supreme Court disbarment order).

[14] "Q:  So fast-forward to today.  Who are the three trustees today?
   A: Greg, Steve, and Lori."  Tr. 24:06–19.

[15] JX 16 (Emergency Guardianship Motion in the Circuit Court for Cecil County); Tr. 24:22–25:03.

American Express Card, and withdraw funds from Decedent's bank account for Gregory's "own personal use."[16]

In the course of the emergency guardianship proceedings, Lori challenged the validity of "a number of documents, including financial and medical powers of attorney presented by Gregory Palumbo."[17] The Maryland Court heard evidence and found that these documents are "invalid and of no force or effect . . . ."[18] The Maryland Court adopted in full the findings of an independent investigator.[19]

The investigator's report details numerous allegations by all three siblings. Lori alleged that Gregory forged the Durable POA and Healthcare directive, noting the Decedent's incapacity to sign during the previous two years.[20] Lori accused Gregory of emotional and financial abuse, such as purchasing an automobile for Decedent when Decedent could no longer drive, then retaining that vehicle and allegedly committing crimes in the vehicle.[21] She contended that Gregory stole

---

[16] JX 16, ¶¶ 10–15; Tr. 25:06–10.

[17] JX 14 (Order Regarding Validity of Documents and Jurisdiction for Guardianship Case).

[18] *Id.*

[19] *Id.*; *see* JX 19 (Report of Independent Investigator); Tr. 32:10–20.

[20] JX 19, 3.

[21] *Id.*

4

medication from Decedent, poisoned the proverbial well against Stephen, and emotionally manipulated Decedent to give Gregory money.[22]

Stephen testified that Decedent's initial Advance Medical Directive named both Stephen and Gregory as medical decision makers, and that he was unaware of the amended Power of Attorney and Advance Medical Directive until after Decedent's stroke in 2021.[23]  Stephen also testified that Gregory proceeded to take "nearly $80,000" out of Decedent's company account in the fall of 2021, after Decedent had suffered a stroke and "was incapacitated."[24]

Gregory alleged in response that Stephen abused and neglected Decedent, plotted to remove Decedent from Decedent's business, and that Stephen's neglect resulted in Decedent falling and suffering from a brain hemorrhage and stroke.[25] Gregory alleged that Lori had minimal contact with Decedent, only seeing him a handful of times per year, and "often cancelling planned visits . . . caus[ing] [Decedent] depression."[26]

---

[22] *Id.*

[23] *Id.* at 6.

[24] Tr. 25:13–16.

[25] *Id.* at 5.

[26] *Id.*

5

The investigator concluded that the Durable Powers of Attorney (both executed in 2019), and Appointment of Agent and Power of Attorney (including an Advance Medical Directive) should be "viewed with skepticism by the Court absent compelling testimony by parties familiar with the document and its execution."[27]

**B.      Prior to Decedent's death, Gregory wrongfully took money from Decedent and his businesses.**

Both Lori and Stephen testified that Gregory misappropriated their father's money prior to his death. Lori estimated that Gregory expended $15,000–$20,000 per month on credit cards belonging to Decedent's store.[28] Gregory also allegedly took $275,000 from Decedent's UBS account.[29]

---

[27] *Id.* at 14–15. On myriad occasions throughout trial, Gregory launched a collateral attack of the veracity and credibility of the handwriting expert's report, which the Maryland Court adopted. *See, e.g.*, *id.* at 98:13–100:21; *see also* Pet'rs' Ans., ¶ 1 ("[M]any if not all of these issues have already been addressed in Court proceedings in Maryland and the allegations have been shown to be false."). At trial, I articulated that I would not entertain any such collateral attack, and that examination regarding the handwriting expert exceeded the proceeding's proper scope. Tr. 100:13–17 ("[I]f we're going to relitigate whether [the handwriting expert's] analysis was appropriate, that's too far. The court's order is the court's order. I'm not going to find something different than the court did.").

[28] *Id.* at 26, 16–18, 109:01–08; *see* JX 11 (2022 UBS account statements). Lori testified that independent documentation and a tax accountant who reviewed the relevant bank statements corroborated that Gregory had wrongfully withdrawn money. Tr. 109:10–19.

[29] Tr. 92:17–20.

6

### C. Following Decedent's death, Lori and Stephen are appointed executors and administer his estate.

Fourteen to fifteen months following the Maryland Court's grant of emergency guardianship, Decedent passed away.[30] The State of Maryland appointed Lori and Stephen as personal representatives of the estate.[31]

Lori and Stephen retained an attorney, C. Edward Hartman, III, to aid in administering their estate.[32] Mr. Hartman presented to the Maryland court his clients' belief that Gregory would not be an appropriate personal representative, given his recent criminal charges.[33] Even though Decedent's will enumerated all three children as personal representatives, the Maryland Court granted Lori and Stephen's motion, and Gregory was not appointed.[34]

Decedent's estate proved exceedingly complex. The primary assets within the estate included a home in Elkton, Maryland, personal property within the home, and a UBS account.[35] However, Decedent owned numerous properties, many of which through different LLCs, and each LLC tended to have "a different ownership

---

[30] *Id.* at 33:02–05.

[31] JX 12 (Maryland Letters of Administration); Tr. 33:10–34:03.

[32] Tr. 61:04–08.

[33] *Id.* at 62:19–63:08.

[34] *Id.* at 63:23–64:05.

[35] *Id.* at 34:07–09.

7

status."[36]    Mr. Hartman admitted that Gregory's interference with Lori's and Stephen's administration of the estate further complicated affairs and "ma[de] things more difficult."[37]

As administrators, Lori and Stephen ensured payment of taxes on the estate and distribution of property to the beneficiaries of the estate: Lori, Stephen, and Gregory.[38]    While Lori and Stephen wrapped up administration of the estate, Gregory instituted a Maryland lawsuit against them, bringing exceptions to the estate accounting.[39]    Gregory challenged, *inter alia*, (1) failure to account for $26,000, (2) failure to file timely tax returns, and (3) improper distributions of personal property.[40] The Maryland Court denied exceptions and permitted Lori and Stephen to close out the estate.[41]

### D.    Lori and Stephen sell the Elkton, Maryland property.

As administrators of the estate, Lori and Stephen determined to sell Decedent's Elkton, Maryland property.[42]    Decedent had titled the property in an

---

[36] *Id.* at 64:09–65:19.

[37] *Id.* at 65:07–19.

[38] JX 8 (Disbursements), 9 (Distribution and inheritance tax).  The distributions to the beneficiaries were made in trust.  Tr. 36:08–11.

[39] JX 23 (summarizing the exceptions).

[40] *See id.*; Tr. 65:24–67:21.

[41] Tr. 41:14–20.

[42] *Id.* at 42:02–07.

8

LLC, 120 Riverside Drive, LLC.[43]  The LLC granted Stephen and Lori authority to act on its behalf.[44]  Due to their joint 66% ownership in the LLC, they were able to sell the property without Gregory's authorization.[45]

Lori's husband, Tim Lukk, served as real estate agent in the sale.[46]  Despite Gregory's current protestations that using a family member as a real estate agent creates a conflict of interest, Lori's and Stephen's Maryland counsel advised them that using Lukk would not create any such legal problems.[47]

---

[43] *Id.* at 68:03–05.

[44] *Id.* at 69:01–05.

[45] *Id.* at 69:05–07.

[46] *Id.* at 42:17–21.

[47] *Id.* at 43:13–16.  Stephen and Lori first petitioned the Maryland Orphans' Court for authority to appoint Mr. Lukk as realtor.  *Id.* at 68:12–16.  However, once they realized that an LLC owned the property, not the estate, they withdrew the petition and sold the property with Mr. Lukk as realtor.  *Id.* at 68:17–24.  Mr. Hartman explained that no conflict of interest would lie with Mr. Lukk's appointment because the incentives of all parties were aligned:

> There's no benefit for anyone, especially for Mr. Lukk in this instance, to take action that would reduce the purchase price of the property.  That would hurt his wife and his brother-in-law, and himself if he's working on a commission, as realtors do.  His interests are actually aligned with those of the owners -- with those of the LLC and of the members of the LLC in maximizing the return for the sale of the property, which I understand he did.

*Id.* at 69:18–70:02.

9

Lukk obtained an appraisal of the property for $625,000.[48] He ultimately sold it for $610,000, which is 97.6% of the appraised price.[49] Mr. Lukk took a reduced commission on the sale.[50]

### E. The three siblings reach a deadlock in overseeing the trust.

At trial, Lori testified that she and Stephen had encountered numerous problems working with Greg as co-trustees.[51] While several issues arose prior to Decedent's death and administration of the estate, the siblings found themselves at loggerheads regarding the sale of real estate in New Castle, Delaware.

Lori testified that while she and Stephen agreed to sell, they sent the necessary papers to Gregory while he was incarcerated, and he rejected the sale.[52] Gregory objected only after the property spent nearly a year on the market and a buyer signed

---

[48] *Id.* at 151: 17–19.

[49] *Id.* at 151:20–21, 152:02–03.

[50] Mr. Lukk took a 3% commission on the sale, totaling approximately $18,000. *Id.* at 152:04–05. Mr. Lukk acknowledged that there is no commission "standard rate" for realtors in the area, but that his usual commission is 6%. *Id.* at 139:01–13. Mr. Lukk calculated his commission as 5.5%, with 2.5% going to the buyer's realtor, and 3% going to him. *Id.* at 138:13–16.

[51] "Q: Do you remember who the trustees were of the trust?
A: Me, Steve, and Greg.
Q: Are those still the three trustees today?
A: Correct.
Q: How is that working out for everyone?
A: It's not." *Id.* at 105:02–09.
[52] *Id.* at 106:08–19.

a contract on the house, obtained a mortgage, and conducted final inspection.[53] Were Gregory to be removed as trustee, Lori believed that she and Stephen could quickly finalize the sale of the New Castle property, free from "issues or problems or exceptions or a continuation or an appeal."[54] Stephen acknowledged that only a few items remain for the trustees to close out the trust, such as selling the remaining properties, submitting a final accounting to the court, and disbursing remaining funds to the beneficiaries.[55]

Testimony also indicated that Gregory's conduct constituted a significant roadblock. Mr. Lukk observed Gregory's personal misfeasance toward Lori: "Just drama, phone calls, harassment, it's been year after year -- it's been since Mr. Palumbo passed, it's just been nothing but drama."[56] Stephen recounted that Gregory has been "hostile, argumentative unagreeable."[57] During the pendency of

---

[53] *Id.* at 137:14–19, 140:02–08; JX 1 (Contract of sale for the New Castle property).

[54] Tr. 117:13–18.

[55] *Id.* at 46:23–47:03.

[56] *Id.* at 137:01–03.

[57] *Id.* at 45:19–20. *See id.* at 45:22–46:01 ("[Gregory] has made threats to Lori and I, whether it's veiled or not veiled. Having the pleasure of taking me down next two years was one comment, taking me out at the knees."). During Gregory's cross of Stephen, Stephen clarified that the harassment had been constant and numerous: "You had been hostile to myself and my sister and [Mr. Lukk] and my wife . . . a number of times. . . . Dozens and dozens of times." *Id.* at 55:23–56:06. As a result of such harassment, Stephen had even gone to the police, although the police had informed him that absent an "outright physical threat of harm," Stephen lacked any recourse. *Id.* at 57:13–24.

this case, Gregory filed an action against Stephen and Lori in Pennsylvania state court alleging some combination of defamation, malice, and fraud.[58]

### F. Procedural History

Despite the routine claims and counterclaims at issue, the travel of the case was replete with twists, speedbumps, and delays.

### 1. Initial Petition and Counter-Petition.

On August 14, 2024, Stephen and Lori filed an Amended Petition for Removal of Co-Trustee.[59] The Amended Complaint requested removal of Gregory as a co-trustee, arguing that Gregory's removal is permitted under 12 *Del. C.* § 3327 and mandated under both Pennsylvania law and the Pennsylvania Rules of Disciplinary Enforcement.[60]

Gregory initially obtained an attorney and filed his answer to the Petition.[61] The Answer contained a counterclaim entitled Petition for Accounting."[62] In the counterclaim, Gregory admitted his "willing[ness] to resign as Trustee," and

---

[58] *Id.* at 116:14–21; *see also* RPTB, 9, D.I. 86 ("Same is now being litigation [sic] in a Court of Common Pleas Civil Action entitled *Gregory and Lisa Palumbo v. Stephen Palumbo and Lori Palumbo Lukk, Philadelphia CCP, Docket No. 260102722 . . . .*") (italics in original).

[59] D.I. 9.

[60] Compl., ¶¶ 13, 15–17, (a).

[61] D.I. 11.

[62] Resp't's Ans. ¶¶ 19–22.

12

requested that the Court either "appoint a new Trustee . . . to prevent further misconduct by Petitioners in Respondent's absence," or replace all three siblings as "trustees in light of Petitioners' misconduct . . . ."[63]  The counterclaim further included an express request for trust accounting under 12 *Del. C.* § 3581(4).

The Petition for Accounting further included a summary of alleged misconduct committed by the Petitioners:

> a. Removed valuable tangible property from the Estate Home, including, without limitation, valuable artwork, statutes, furniture, electronics, $35,000.00 in cash from the Estate Home's safe, and two motor vehicles;
> b. Acting without Respondent's consent; and
> c. Misappropriating over $200,000.00 from the UBS account managed by the Trustees;
> d. The wrongful sale of Decedent's home in Elkton, MD for less than appropriate value and without notice or consent of respondent; and
> e. The attempted wrongful sale of the decedents second home in New Castle, DE without any notice or consent of respondent which respondent quashed a day before closing by written notice sent by federal express; and
> f. The wrongful use (in both above instances) of a realtor married to trustee Lori Palumbo-Lukk (Timothy Lukk) without notice or consent of respondent and which is a conflict of interest in itself.[64]

---

[63] Resp't's Ans. ¶ 22.

[64] *Id.* at ¶ 19.

Lori and Steve filed an answer denying the propriety of an accounting and the request to appoint a replacement trustee for Gregory.[65] The parties proceeded to discovery, and the Court scheduled a one-day trial for September 30, 2025.[66]

### 2. The initial trial date is delayed due to scheduling order violations and withdrawal of Gregory's counsel.

Several weeks prior to the trial, Petitioners filed a Motion in Limine to preclude Respondent from introducing documents at trial due to discovery violations on Respondent's behalf.[67] Respondent had also failed to participate in the Pre-Trial stipulation, and accordingly only Petitioners's portions were included.[68] Respondent also failed to file his exhibits in the joint exhibit submission, and the Court only received Petitioners's exhibits.[69]

And the filing continued. Respondent's attorney filed a Motion to Withdraw, and Gregory requested a sixty-day continuance to obtain replacement Delaware counsel. While represented, Gregory attempted to file his own Joint Pre-Trial Stipulation one week past the deadline, but Greg's stipulation lacked signatures from his own attorney and opposing counsel.

---

[65] D.I. 15.

[66] D.I. 26.

[67] D.I. 33.

[68] D.I. 34.

[69] D.I. 36.

I granted Respondent's counsel's Motion to Withdraw and approved Petitioners' Motion in Limine.[70]  I also postponed trial and rescheduled it for February 12, 2026.[71]  Despite the more than four-month delay, Greg never obtained replacement counsel and instead proceeded *pro se*.[72]  Because of Respondent's failure to comply with the case deadlines, I limited Respondent to "documentary evidence provided by [September 12, 2025] notwithstanding discovery stipulated by petitioners."[73]

### 3.  Just before the trial date, Gregory seeks to file for Summary Judgment and injects new arguments into the case.

Before the February trial date, Gregory submitted a letter to the Court requesting leave to file a Motion for Summary Judgment.[74]  The letter offered Respondent's explanation for the behavior that led to his incarceration and disbarment.[75]  Respondent again alleged a flurry of illegitimate behavior by Petitioners regarding assets in Decedent's estate, including (1) removal and

---

[70] D.I. 44.

[71] D.I. 47.

[72] *See* Tr. 119:08–120:04 (reflecting that Gregory only ever had one attorney during the pendency of the action).  I note that although Gregory is technically *pro se*, he was a practicing Pennsylvania attorney for approximately 30 years.  He is not unsophisticated in matters of the law.

[73] D.I. 44.

[74] Letter to the Court from Gregory Palumbo (hereinafter "MSJ Letter"), D.I. 50.

[75] MSJ Letter, 1–3.

conversion of personal property, (2) sale of the Elkton, Maryland residence below fair market value, and (3) attempted sale of the New Castle, Delaware residence, all previously alleged in the paragraphs accompanying Respondent's Cross-Petition for Accounting.[76]  In the letter, Respondent for the first time explicitly alleged Petitioners' breach of the fiduciary duty of loyalty due to purported self-dealing, aiding and abetting the breach of fiduciary duty, and unclean hands (although not stylized as an affirmative defense).[77]  I denied Respondent's leave to file a Motion for Summary Judgment noting that while "Respondent has had ample opportunity to file a dispositive motion," he only submitted his request "at the eleventh hour . . . ."[78]

### 4. At trial, the Court excluded numerous pieces of evidence proffered by Gregory.

Three days before trial, Gregory filed an exhibit list spanning twenty-six exhibits and 201 pages.[79]  Petitioners relied upon the same exhibit list filed on September 12, 2025.  In response to Gregory's new exhibit list, Petitioners filed a

---

[76] *Compare* MSJ Letter, 3, *with* Resp't's Ans. ¶ 19.

[77] *See* MSJ Letter, 4–6.

[78] Letter from the Court to Gregory Palumbo, 1, D.I. 51.

[79] *See* Letter from Brian J. Ferry to Magistrate Hume in response to exhibit list filed by Gregory M. Palumbo ("Pet'rs' Motion in Limine"), D.I. 56.  No docket entry for Gregory's evidentiary exhibit list exists because the Register in Chancery rejected Gregory's filing for noncompliance with the Court's filing procedures.

motion in limine to exclude eleven of the proposed exhibits.[80] Petitioners objected to ten of these exhibits on the ground that Gregory had failed to produce them during discovery, and one of them would be "overly prejudicial" to Petitioners.[81] Petitioners objected to one exhibit as subject to Attorney-Client Privilege and only inadvertently produced during discovery.[82]

At trial, prior to Petitioners' case-in-chief, I heard brief argument on the parties' evidentiary objections. During this colloquy, I inquired about the relevance of the challenged evidentiary exhibits. Gregory asserted that the exhibits met the D.R.E. 401 relevance test because he believed the evidence went to "bias and credibility" and impeachment on cross-examination.[83]

---

[80] *See id.* Petitioner further advanced the general objection that "the majority of Respondent's Exhibits are not relevant to this Petition" and reserved further objections for trial. *Id.* at 1.

[81] *Id.* at 2 (objecting to Respondent Exhibits G, H, I, J, Q, R, V, W, Y, and Z). Petitioners' motion accorded with my previous order restricting Gregory's ability to introduce evidence due to his failure to comply with discovery deadlines in advance of the planned September 2025 trial date. *See* Tr. 03:10–14 ("[W]hen we had our last meeting or prior to our pretrial conference, we had our meeting back in September where the trial was continued, and I granted the motion in limine to proscribe any additional items being presented in discovery.").

[82] *See* Pet'rs' Motion in Limine, 2 (objecting to Respondent Exhibit U).

[83] *See* Tr. 03:21–24 ("As Your Honor has stated, these go to bias and credibility, which, of course, is a proper area to explore on cross-examination for any witness."); *id.* at 04:23–05:03 ("[B]ut I believe that these are grounds that I should be able to explore on cross-examination if [Stephen] goes to the issue of perhaps his inability or his desire not to harm his father, which is rooted in this.").

I reminded Gregory that the trial concerned two claims: (1) removal of Gregory as trustee and (2) trust accounting, again raising the relevance question. Gregory asserted that he would rely on the Pennsylvania law of familial trusts, which provided a general exception to Delaware law recognizing that "the Trust and its assets should not be placed at unnecessary risk by having a convicted felon as trustee.[84] *In the Matter of Trust U/A McKinley*, 2002 WL 1271684, at *5 (Del. Ch. May 24, 2022). Gregory also asserted that even if he were removed as trustee, Lori and Stephen would still bear "the burden to show that they have the ability to be trustees . . . ."[85]

Gregory again relied on Petitioners' purported burden to demonstrate entitlement to remain as trustees in response to my questioning about the Attorney-Client Privilege waiver question.[86] Despite never having filed a counterclaim for removal of trustees, Gregory maintained that he had raised the issue in his answer

---

[84] *See id.* at 06:11–14 ("There's an exception to this law that we speak about, at least in Pennsylvania, and familial trusts, trusts within the family are not part of what the statute indicates."). Gregory failed to ever produce any citations to law supporting his proposition. *See* PPTB, 7 ("The only response that Respondent could muster was that he believes that there are exceptions to that rule, but he did not have any such exceptions available in front of him. Of course, the exception referenced by Respondent does not exist.") (internal citations omitted).

[85] Tr. 06:06–07.

[86] *See id.* at 10:08–12:19.

18

and "as an affirmative defense and as part of new matters, so to speak, in that pleading."[87]

Following the brief hearing on the evidentiary objections, I ruled to exclude the exhibits as substantive evidence from Gregory's case-in-chief for lack of relevance to the two claims at issue.[88]  I also ruled that Petitioners did not waive attorney-client privilege through the inadvertent production of one document.[89]

### 5. The Court holds a one-day trial and hears witness testimony from both parties.

Immediately following the pre-trial Motion in Limine hearing, the case proceeded to trial.  There, Petitioners called four witnesses.  Respondent called only one witness in his case-in-chief.  At the close of trial, I requested post-trial summations from both parties.[90]

Amid submitting their summations, Gregory filed a motion for an amended petition under Court of Chancery Rule 15(b), which permits an amendment to

---

[87] *Id.* at 13:04–07.

[88] *Id.* at 13:17–16:03.  In my ruling, I clarified that "I don't think an affirmative defense is a claim," and that the removal of Lori and Stephen as trustees was not at issue in the case. *Id.* at 13:17–24.  I acknowledged that Gregory may be able to rely on the exhibits in cross-examination, although the "right to cross-examination is not absolute" because I possessed discretion to not bar "cross-examination on topics of marginal or minimal relevance solely on the conjecture that bias or prejudice might be disclosed." *Id.* at 14:15–21 (quoting *Allen v. State*, 970 A.2d 203, 214 (Del. 2009)).

[89] *See* Tr. 131:13–133:05.

[90] *Id.* at 173:11–15.

conform the evidence to the pleadings presented. *See* Ct. Ch. R. 15(b)(2) ("When an issue not raised by the pleadings is tried with the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform to the evidence and to raise an unpled issue."). Gregory argued that the Court heard evidence objecting to "Petitioners' fitness to remain trustees," despite not being included "in a separate pleading or a heading which was entitled 'Removal of Petitioners as Trustees.'"[91]

I denied Gregory's motion to amend.[92] In my denial, I expressly noted that prior to trial "I declined to allow Respondent to present extraneous evidence to support this unfiled claim."[93] I again articulated that asserting an affirmative defense is not tantamount to bringing a petition or claim and consequently excluded affiliated evidence.[94]

---

[91] Motion to File Amended Complaint (Petition), ¶ 5, D.I. 78. Gregory maintained that the lack of an express heading asserting a claim to remove the trustees did not mean he did not counterplead a claim to remove Petitioners as trustees. *See id.*

[92] D.I. 85.

[93] *Id.*

[94] *Id.* ("I ruled that this claim was not properly pled and that the evidence was irrelevant and inadmissible. Thus, there was limited factual development of this issue at trial and no opportunity for Petitioners to confront the issue.").

20

I received the parties' post-trial summations and took the matter under advisement.[95]  This is my ruling granting Lori and Stephen's petition to remove Gregory as trustee and denying Gregory's cross-petition for an accounting.

## II.  ANALYSIS

### A.  Gregory's removal as trustee is appropriate both because of his stipulation to do so and under 12 *Del. C.* § 3227.

The first issue is removal of Gregory as trustee.  Lori and Stephen presented three primary reasons why Gregory should be removed: (1) Gregory's criminal convictions and disbarment, (2) Gregory's lack of cooperation in trust administration, and (3) Gregory's treatment of Decedent while alive.

Lori and Stephen's first argument, that Gregory's criminal history and disbarment render him ineligible to continue serving as trustee, provides sufficient basis to grant Petitioners' request for removal.

---

[95] I note for the record that Gregory belatedly filed his post-trial summation.  I find his reasoning for delayed filing spurious and unconvincing.  The parties had jointly stipulated to filing summations "within 45 days of the Parties receipt of the trial transcript."  Letter from Brian J. Ferry to Magistrate Hume regarding post trial summations, 1, D.I. 71.  The Court reporter made the transcript available on February 23, 2026, and notified the parties. *See id.* at Exs. A, B.  Petitioners' counsel notified Respondent of the finalized transcript on February 25, 2026 and expressly clarified that the post-trial briefs would be due on April 9, 2026. *Id.* at Ex. C.  Gregory acknowledged receipt of opposing counsel's email. *See id.* Despite documentary evidence to the contrary, Gregory asserted that he never received contemporaneous notice from opposing counsel due to international travel and only saw the email on April 4.  Letter to the Hon. David Hume, IV, 2, D.I. 77.  Gregory never explained his February 25th acknowledgement of receipt.  Gregory ultimately filed his post-trial summation on April 22, 2026. *See* RPTB.

Delaware Code empowers this Court to remove a trustee on several grounds:

> [T]he Court of Chancery may remove an officeholder . . . on petition of a trustor, another officeholder, or beneficiary if:
> (1) The officeholder has committed a breach of trust; or
> (2) The continued service of the officeholder substantially impairs the administration of the trust; or
> (3) The court, having due regard for the expressed intention of the trustor and the best interests of the beneficiaries, determines that notwithstanding the absence of a breach of trust, there exists:
>     a. A substantial change in circumstances;
>     b. Unfitness, unwillingness or inability of the officeholder to administer the trust or perform its duties properly; or
>     c. Hostility between the officeholder and beneficiaries or other officeholders that threatens the efficient administration of the trust."

12 *Del. C.* § 3327.

While I have the discretionary power to "remove a trustee who fails to perform his duties through more than mere negligence," *McNeil v. McNeil*, 798 A.2d 503, 513 (Del. 2002), I also acknowledge that "removal of a trustee is an extreme form of equitable relief that should be exercised sparingly." *Tigani v. Tigani*, 2021 WL 1197576, at *21 (Del. Ch. Mar. 30, 2021) (internation quotations omitted), *aff'd*, 271 A.3d 741 (Del. 2002). Our caselaw distinguishes between "a mere lack of confidence in the trustee by some [beneficiaries]" or "mere negligent breach of duty," which provide insufficient grounds to remove a trustee, and endangering trust property "by a lack of capacity, honesty, or fidelity," which supports removal. *Sweeney v. Sweeney*, 2024 WL 3040424, at *13 (Del. Ch. June 24, 2024) (quoting *In re Catell's Est.*, 38 A.2d 466, 469–70 (Del. Ch. 1944)).

22

Sister jurisdictions have found that "[i]f a trustee is found *guilty of a crime* or other conduct involving dishonesty, the court may find that he is unfit to be a trustee, even though the reprehensible actions were not connected with the trust administration." BOGERT'S THE LAW OF TRUSTS AND TRUSTEES *Grounds for Removal* § 527 (2026). For example, the New Jersey Supreme Court affirmed the Chancery Division's removal of an executor trustee, attorney Dougal Herr, due to his "unethical conduct" regarding a separate inter vivos trust. *In re Breckwoldt*, 125 A.2d 721, 723 (N.J. 1956). *Breckwoldt* deferred to the broader principle that "malfeasance in the one office is inconsistent with continuance in the other." *Id.* (citing 1 SCOTT ON TRUSTS § 107 (1939)). Similarly, a Pennsylvania decision affirmed removal of a trustee where the trustee (1) had been convicted and sentenced for crimes of dishonesty and (2) subject to state bar disciplinary proceedings for such misconduct, because the removed trustee "is not one to whom this court could creditably entrust the management, even with others, of an estate the sole beneficiary whereof has no confidence in such person." *In re Rentschler's Estate*, 139 A.2d 910, 916 (Pa. 1958); *accord* RESTATEMENT (THIRD) OF TRUSTS § 37 cmt. e ("A few statutes bar persons convicted of a felony from being fiduciaries. . . . Even without a specific statute, a convicted criminal may be removed under more general standard.") (citing *Jones v. McGuirt*, 416 So. 2d 970 (Ala. 1982)).

23

Delaware lacks a statute specifically barring convicted felons from serving as fiduciaries, although it does bar "person[s] convicted of a crime" from receiving letters testamentary or of administration. 12 *Del. C.* § 1508. Nevertheless, this Court has previously recognized that a trust possesses a legitimate interest in protecting itself against a trustee with a criminal conviction. *See In re Trust u/a McKinley*, 2002 WL 1271684, at *5 (Del. Ch. May 24, 2002) (holding that the removal of an "untrustworthy fiduciary" is a benefit that "would also inure to the Trust" and not constitute self-interested behavior).

Notably, Pennsylvania does prevent disbarred attorneys from serving as fiduciaries: Disbarred attorneys must "resign all appointments as personal representative, executor, administrator, guardian, conservator, receiver, trustee, agent under a power of attorney, or other fiduciary position." Pa. R.D.E. 217(d)(3)(i).[96]

Gregory stipulated at trial that the Pennsylvania Rules of Disciplinary Enforcement mandate his resignation as trustee because the Pennsylvania Supreme

---

[96] This is how Pennsylvania courts stylize the "Pennsylvania Rules of Disciplinary Enforcement." *See generally* Att'y T. v. Off. of Disciplinary Counsel of Pa., 547 A.2d 350 (Pa. 1988).

Court disbarred him.[97]  Gregory also stipulated to his "criminal issues in Pennsylvania."[98]

While the parties have not briefed whether the Pennsylvania Rules of Disciplinary conduct applying to disbarred attorneys requires this Court to remove Gregory as trustee, Gregory's stipulation permits me to assume and apply without deciding that Gregory is bound by the Rules and must resign.[99]

---

[97] "ATTORNEY FERRY: Your Honor, I was intending to go through the Pennsylvania Rules of Disciplinary Enforcement, in particular the ones --
GREGORY PALUMBO: Your Honor, I don't believe that Stephen Palumbo would have full knowledge of those rules, but I'll stipulate to that as well.
ATTORNEY FERRY: If Mr. Palumbo will stipulate to Pennsylvania Rules of Disciplinary Enforcement, then I will --
GREGORY PALUMBO: So stipulated, Judge."  Tr. 44:13–23.

[98] "Q: What can you tell the Court about your brother's criminal issues in Pennsylvania?
GREGORY PALUMBO:  Your Honor, I would stipulate to those."  *Id.* 44:06–09; *see* Resp't's Ans. ¶ 9 (noting that Petitioners' averment regarding his crimes "refer to a document which speaks for itself" and noting that offense "other than robbery and carrying a firearm" were dismissed at sentencing); JX 13 (Docket History from the Court of Common Pleas of Chester County reflecting eight discrete criminal charges against Respondent); PTO ¶ 12 (stating Respondent's conviction of multiple felonies in Pennsylvania in September 2023).

[99] *See* Deutsche Bank Tr. Co. Ams. v. Royal Surplus Lines Co., 2012 WL 2898478, at *8 (Del. Sup. July 12, 2012) ("stipulations are binding on the parties and are conclusive as to the subject matters of the stipulation."); Merritt v. Utd. Parcel Serv., 956 A.2d 1196, 1201 (Del. 2008) ("Voluntary and knowing concessions of fact made by a party during judicial proceedings . . . are termed 'judicial admissions.'").  Principles of comity and respect for the state bars of sister courts also encourage me to recognize and apply the Pennsylvania Rules of Disciplinary Enforcement in this suit.  Considering (1) the discretion afforded to me under 12 *Del. C.* § 3227, (2) Gregory's breach of trust through his criminal behavior, and (3) Delaware's interest in ensuring the trustworthiness of fiduciaries, the Pennsylvania Rule counsels me to remove Gregory from his position.  *See* Columbia Cas. Co. v. Palytex FP, Inc., 584 A.2d 1214 (Del. 1991) ("Comity permits one state to give effect to the laws

25

Gregory's criminal behavior and disbarment taken alone constitute sufficient breaches of trust to justify removal under the Delaware code. Independent from Gregory's stipulated misconduct, however, I hold that Gregory's "misgivings" in the recent past similarly recommend his removal as trustee.[100]

Lori and Stephen provided credible evidence that Gregory (1) forged estate planning documents, (2) withdrew money without authorization from Decedent's accounts, and (3) substantially interfered with his co-trustees' administration of the trust.

The Cecil County Court of Common Pleas held that Power of Attorney and Advanced Medical Directive documents relied upon by Gregory prior to his father's death are "invalid and of no force or effect," leading to a plausible inference that they were forged or at least invalid.[101] Despite Gregory's numerous attempts to collaterally attack the legitimacy of the Maryland guardianship proceedings, such attacks fall well beyond the scope of this proceeding and, even if considered, fail to overcome the Maryland court's adoption of the investigator's findings.

---

of a sister state, not out of obligation, but out of respect and deference.") (citing 16 AM. JUR. 2D, *Conflict of Laws* § 10 (1979)).

[100] *See* PPTB, 8 ("Greg had committed a number of misgivings over the years that have eroded his siblings' trust and have rendered him unfit to serve as Co-Trustee.").

[101] JX 14 at PALUMBO0110.

Moreover, Lori and Stephen presented credible testimony that Gregory misappropriated funds from Decedent's UBS account and by unauthorized expenditures on Decedent's company's credit cards.

These findings alone constitute a breach of trust under 12 *Del. C.* § 3227(1). Forging documents to take advantage of an aged family member and misappropriating money from such family member's financial accounts endangers trust property "by a lack of capacity, honesty, or fidelity." *Sweeney*, 2024 WL 3040424, at *13.

The ongoing hostility between Gregory and his family members, especially Lori and Stephen, further indicates "[h]ostility between the officeholder and beneficiaries or other officeholders that threatens the efficient administration of the trust." 12 *Del. C.* § 3227(3)(c). Making threats that results in a co-trustee seeking recourse from the police and subjecting co-trustees to verbal harassment interferes with the proper management of trust assets. While Gregory's refusal to close on the New Castle property alone would not threaten "efficient administration," his aggressive and malicious behavior toward his fellow trustees constitutes such hostility to throw into question whether the trust can be properly administered.

**B.    Gregory's cross-petition for accounting is denied for want of any evidence or argument in support.**

Gregory's sole cross-petition was for a trust accounting. Surprisingly, at trial, Gregory only presented one witness, whose testimony had no bearing on the petition

27

for accounting.[102] Gregory's post-trial summation focuses on breaches of fiduciary duties committed by Lori and Stephen, not his entitlement to a trust accounting.[103] Because Gregory has failed to provide any argument or evidence in support of his petition, it must be denied. *See Robinson v. Darbeau*, 2021 WL 776226, at *10 n.114 (Del. Ch. Mar. 01, 2021) ("Typically, a failure to brief an argument constitutes waiver of the argument"); *accord Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). And yet, Gregory devotes significant verbiage to claims inadequately pleaded in his cross-petition. I address these in turn.

### 1. Respondent failed to adequately plead a claim for removal of his co-trustees.

Gregory first contends that he adequately pleaded a claim to remove Lori and Stephen as trustees. Our Court rules require a party to "plead a short and plain statement of a claim for relief showing that the pleader is entitled to relief, and a demand for judgment for the relief to which the party deems itself entitled." *Matters*

---

[102] Respondent's sole witness, Michael Zacco, testified about the veracity of Decedent's signature on several documents. *See* Tr. 165–171. Gregory appears to have called Mr. Zacco as part and parcel of his collateral attack on the Maryland Court ruling regarding the forged documents. I already rejected Gregory's line of argument on this point and will not further consider it here. *See supra* n.25.

[103] *See generally* RPTB.

28

*of Estate and Tr. of Kalil*, 2018 WL 793718, at \*17 (Del. Ch. Feb. 7, 2018) (citing Ct. Ch. R. 8(a)).

In his counter-petition, Gregory included the heading "Petition for Accounting," followed by allegations of Petitioners' misconduct and two claims for relief: (1) a trust accounting under 12 *Del. C.* § 3581(4) and (2) "appoint[ment] of a new Trustee in his place to as to prevent further misconduct by Petitioners in Respondent's absence, or that this Honorable Court replace all trustees in light of Petitioners' misconduct as set forth hereinabove."

Respondent likely intended to cite 12 *Del. C.* § 3581(b)(4), which permits the court to "remedy a breach of trust that has occurred or may occur" by "ordering a trustee to account." The same statute also permits the Court to suspend or remove a trustee for a breach of trust. *Id.* at § 3581(b)(6). Notably, however, Respondent never invoked this code section in his counter-petition, in his pre-trial stipulation, or in his post-trial summation.

Respondent cites numerous Delaware cases for the proposition that his counter-petition to remove co-trustees meets Delaware's notice-pleading standard. He argues that even if the Court considers his pleadings to be "unclear" or "inartfully

pled,"[104] then the proper procedural rejoinder is a motion for a more definite statement under Court of Chancery Rule 12(e), not dismissal.

Such argument cannot prevail. First, Respondent misapprehends the objections of the opposing party and the statements of the Court. No motion to dismiss is before me. Instead, I have continuously articulated that Respondent's counter-petition only requests an accounting, and that he never adequately pleaded a claim for removal.

Moreover, many of the cases cited by Respondent in support of his proposition neither expressly state nor even suggest the statements for which he invokes them. Respondent cites *Kuroda v. SPJS Holdings, LLC* for the proposition that (1) the proper procedural retort to a confusing claim is a Rule 12(e) motion for a more definite statement, (2) that Delaware courts routinely reject "objections as to style" in pleadings, (3) "[e]ven if the pleading is imperfect, dismissal is not warranted where the defendant is on notice of the claim," and (4) that Delaware courts evaluate "based on their substance, not the heading under which they appear." 2009 WL 4345724 (Del. Ch. Dec. 1, 2009).[105] Unfortunately for Respondent, *Kuroda* never

---

[104] *See id.* at 5 (misciting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59 (Del. 1995) for the proposition that a "court will not dismiss a claim simply because it is 'inartfully or confusingly pled.'"); *see infra* n.106 and accompanying text.

[105] RPTB, 5–6.

discusses Rule 12(e) nor stands for any of these principles. Respondent even purports to cite *Kuroda* on two occasions in his post-trial briefing, yet the cited words never appear in the *Kuroda* decision.[106] Respondent's invocation of *Koninklijke v. Philips Electronics N.V.* fares no better. 2009 WL 4345724 (Del. Ch. Dec. 1, 2009). *Koninklijke* similarly does not stand for the proposition that a 12(e) is the appropriate response to unclear pleading that "mixes theories."[107] Respondent's citations seem equally specious as his claim to have properly pleaded removal of his co-trustees.[108] And Gregory is not the typical self-represented litigant seeking to use artificial intelligence to obtain access to the Court. He is a seasoned attorney who understands the repercussions of submitting false authority to a court.

---

[106] *See id.* at 5 ("Even if the pleading is imperfect, dismissal is not warranted where the defendant is **on notice** of the claim.") (emphasis in RPTB, but no emphasis in original because the language does not appear in *Kuroda*), 6 (stating that the Court "looks to the substance of the allegations rather than the form," but *Kuroda* never says nor suggests this). Inclusion of fictitious quotations from cases constitutes one of the hallmarks of Artificial Intelligence usage. *See* An v. Archblock, 2025 WL 1024661 at *1 n.10 (Del. Ch. Apr. 4, 2025) ("AI hallucination is a phenomenon wherein a large language model (LLM)—often a generative AI chatbot or computer vision tool—perceives patterns or objects that are nonexistent or imperceptible to human observers, creating outputs that are nonsensical or altogether inaccurate.") (citing Harris as Next Friend of RNH v. Adams, --- F. Supp. 3d ---, 2024 WL 4843837, at *1 n.3 (D. Mass Nov. 20, 2024)). Abuse of AI in litigation filings comprises an "abuse of the adversary system" and is sanctionable conduct. *See id.* at *2 n.12.

[107] RPTB, 5.

[108] Respondent inadequately reckons with my continued articulation that his petition to remove his co-trustees was not before me. *See* Tr. 11:10–12, 18–19, 13:2–3.

31

### 2. Even if Removal of the co-trustees was before me, Gregory failed to prove his case at trial.

Assuming briefly that Gregory had filed a cross-petition to remove his co-trustees, this claim must nevertheless fail. As stated above, the only evidence in Gregory's case-in-chief related to the validity of a signature already found to be invalid by the Maryland Court. Nevertheless, Gregory argues that he "raised issues of Petitioners' inability to manage the subject estate with credibility, trustworthiness, and fair dealing."[109]

First, Gregory challenges Stephen's and Lori's failure to provide him notice regarding "the sales of either of Decedent's Delaware or Maryland LLC properties and the removal of assets contained, or receipt of monies."[110] Gregory suggests that failure to provide notice violated the fiduciary duties of care and loyalty.[111] These contentions fail on both factual and legal levels.

As discussed above, a Maryland LLC held title to the Maryland property.[112] Gregory never put the LLC agreement before me. Thus, I cannot find, hold, or even opine on (1) whether Lori and Stephen complied with the notice requirements or (2) which law even governs the LLC documents. The only credible testimony on this

---

[109] RPTB, 3.

[110] *Id.* at 6–7.

[111] *Id.* at 7.

[112] Tr. 68:03–09.

topic came from Mr. Hartman, who relayed his belief that Lori and Stephen had authority to sell the property, without any breach of fiduciary duty or conflict of interest.[113]

As for the Delaware property, Gregory encounters a serious problem with his lack of notice argument because he did receive notice and objected to the sale, resulting in the sale's termination. Consequently, it is difficult to ascertain what harm Gregory has suffered.

Second, Gregory challenges Lori and Stephen's use of Mr. Lukk as realtor in the sale of the Maryland property and attempted sale of the Delaware property. Mr. Lukk is not a party in this matter, so any implication that he breached a fiduciary duty to the trust is beyond the scope of this matter. Second, Lori and Stephen presented credible testimony that they relied on the opinion of their lawyer in constructing the relevant trust and LLC documents.[114] Gregory has failed to present any evidence that any of their actions were made in bad faith.[115]

---

[113] *Id.* at 85:11–20.

[114] *See supra* n.47 and accompanying text.

[115] In his post-trial briefing, Gregory argues that testimony revealed that "Petitioners planned and formulated a campaign to influence this Court . . . to harm Respondent, and in this present matter to gain control over the subject trust and estate for their own benefit and gain." RPTB, 14–15. The testimony overwhelmingly indicated that Petitioners acted appropriately and in good faith in instituting the Maryland emergency guardianship motion (in which they prevailed), appropriately withdrew a petition concerning the sale of property

Third, Gregory challenges the misappropriation of the UBS monies. Minimal evidence on this topic was presented at trial, and none from Gregory. On cross-examination, Stephen represented that the accountant identified that $200,000 was missing from the UBS account,[116] and that Stephen believed that Gregory took $275,000 from the account between 2015 and 2019.[117] Gregory provides a factual argument in his post-trial brief, but this is extrajudicial testimony.[118]

Gregory broadly misconstrues impeachment evidence as substantive evidence in his arguments.[119] For example, he suggests that Lori's misstatement that Gregory had two attorneys in this case, instead of one, as substantive evidence that she negligently manages the trust: "How could she not even know, if she is on the pulse of administration of this estate - is remarkable."[120] But Gregory introduced no

---

that was governed by the LLC documents, and not in the estate, and properly instituted this petition to remove a trustee (relief to which the respondent stipulated prior to trial). The evidence does not support Respondent's protestations.

[116] Tr. 93:11–15.

[117] *Id.* at 92:17–20.

[118] Gregory "testifies" in his briefing that the $200,000 in question was jointly owned by himself and Decedent for investment purposes. RPTB, 8. Gregory also indicates that he is suing the Petitioners in Pennsylvania state court on theories of "false and derogatory statements." *Id.* at 9. The record is not before me, I am not bound by any prior ruling on this issue, and it was not presented in evidence.

[119] *See* D.R.E. 607, 613.

[120] RPTB, 19.

*substantive* evidence that Lori negligently managed the trust, apart from his collateral attacks on actions prescribed and permitted by Maryland courts.

Respondent's Cross-Petition for Accounting is denied. Any other relief, such as removal of Lori and Stephen as trustees, is also denied.

## C. I shift fees and costs in Petitioner's favor for Respondent's bad faith conduct throughout the course of the litigation.

Petitioners request that I shift fees and costs in Petitioner's favor because of Respondent's bad faith litigation context. The American Rule, "provid[ing] that each party is generally expected to pay its own attorneys' fees" normally governs in Delaware. *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017). One relevant exception to the American Rule is the Bad Faith Exception. *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998). While no "single definition of bad faith conduct" exits, this court has recognized it where "parties have unnecessarily prolonged or delayed litigation, falsified records[,] or knowingly asserted frivolous claims[,]" in addition to "misle[a]d[ing] the court, alter[ing] testimony, or chang[ing] his position on an issue. *Shawe*, 157 A.3d at 149. "The party seeking fees must demonstrate by clear evidence that the other party acted in subjective bad faith." *Id.* at 150.

Petitioners identify the following conduct as supportive of subjective bad faith:

35

- Misrepresenting to the court that an exception exists to the rule preventing disbarred attorneys from serving as a fiduciary;[121]
- Focusing his cross-examination of Petitioners' witnesses on irrelevant matters beyond the scope of the pleadings, with Petitioners successfully excluding much of the proposed evidence;[122]
- Excessive questioning revealing Gregory's desire to "settle a score" with his siblings through "arguing about personal grievances";[123] and
- Failing to provide any argument or evidence regarding the Petition for Accounting, requiring Petitioner to prepare evidence in defense of this proposed relief.[124]

While Respondent is *pro se* in this matter, he is sophisticated due to his years of practice as an attorney in Pennsylvania. He possesses training and practice in law and submitted himself to be governed by the rules of the Delaware Court of Chancery. Respondent's behavior throughout litigation, including in trial, indicates

---

[121] Tr. 05:10–06:14. Gregory represented that "there's an exception to this law . . . in Pennsylvania, and familial trusts," and that he didn't have the law with him because he did not anticipate "this was going to be made an issue by the Court without the case in chief . . . ." Tr. 06:10–20. Gregory stipulated before trial that his removal was appropriate and that the Pennsylvania law obligated his resignation, yet invoked law contrary to his stipulation, which does not appear to exist, Gregory having failed to alert me to its existence.

[122] *See, e.g.*, *id.* at 161:24–162:01 (Respondent arguing that cross-examination about alleged "fraud on the court" in Cecil County Maryland is relevant and goes to "bias, and bias is admissible, as well as credibility is."). *Id.* at 162:02–05, 163:14–16.

[123] "[Gregory]: You're big on threats; correct?
[Stephen]: Am I big on threats? What do you mean?
Q: Did you ever threaten your father?
A: I have not.
Q: Are you sure about that?
A: I'm certain.
Q: okay."). *Id.* at 90:08–15.

[124] *See generally supra* at § II.B ("Gregory's cross-petition for accounting is denied for want of any evidence or argument in support.").

subjective bad faith conduct. Respondent misrepresented law to the court, knowing it was material to the present issues, and failed to correct his statement. Respondent continuously deployed his opportunity for cross-examination to press witnesses about matters ancillary or irrelevant to the petitions. Respondent committed critical errors in citing law in his post-trial brief, relying on Delaware cases for propositions neither supported nor implicated in the case. Respondent misrepresented communications between himself and Petitioner's counsel regarding the scheduling of the post-trial briefs and claimed to have not timely received opposing counsel's email, despite documentary proof he responded immediately.[125] Respondent's failure to make any case in support of his petition for accounting imposed undue burdens on the Petitioners. Petitioners had to expend time and money to prepare a defense in anticipation of Respondent's probable case. Consequently, the trial consisted of only rebuttal evidence on Respondent's cross-petition, and no evidence in support.

This concert of action supports my finding that Respondent conducted this litigation with subjective bad faith. As a result, I shift fees and costs to the Petitioners.

---

[125] *See supra* n.95 and accompanying text.

## III. CONCLUSION

For the reasons explained above I recommend the following: Petitioners' motion to remove a trustee is granted; Respondent's cross-petition for an accounting is denied.; and fees and costs are awarded to the Petitioner under the bad faith exception to the American Rule.

This is a final report pursuant to Court of Chancery Rule 144.

Sincerely,

*/s/ David Hume, IV*
David Hume, IV
Magistrate in Chancery


cc:     All counsel of record (by File & ServeXpress)

38